The prisoner was found guilty by a jury in Hillsborough Superior Court, and, being brought up to receive judgment, several exceptions were taken in arrest, by his counsel, upon which the presiding Judge directed the case to be sent up to obtain the opinion of this Court. The case was ably argued byHaywood and Duffy for the prisoner, and the Attorney-General for the State.
The following authorities were cited in behalf of the prisoner: 2 Hale's Pl. Cor., 334; Kelyng, 104; 4 Bl. Com., 98, 366; 2 Hawk., 446.
The prisoner has been found guilty of the offense charged in the indictment; whether any, or what punishment, can be inflicted upon him, in consequence thereof, is now to be decided. I will first consider whether we have any authority to inflict punishment (192) upon him, from any act of Assembly.
The Legislature in the year 1774 passed an act, entitled an act to prevent the willful and malicious killing of slaves; by which they annexed the punishment of one year's imprisonment to the commission of the first offense; and have declared that the person upon a second conviction thereof, shall be adjudged guilty of murder, and shall suffer death without benefit of clergy. In the year 1791, another act was passed, for the purpose of examining this act. The preamble of which, sec. 3, expresses "that whereas, by another act of Assembly, passed in the year 1774, the killing of a slave, however wanton, etc., is only punishable in the first instance by imprisonment, etc., which distinction of criminality between the murder of a white person and one who is equally a human creature, etc., is disgraceful to humanity, etc., be it enacted, etc., that if any person shall hereafter be guilty of willfully and maliciously killing a slave, such offender shall, upon the first conviction thereof, be adjudged guilty of murder, and shall suffer the same punishment as if he had killed a free man." If we consider that the mildness of the punishment directed to be inflicted upon the first conviction, etc., *Page 170 
by the former act, is what the latter act in its preamble, sec. 3, complains of, and go no further, our impression at once would be that we had not only power to inflict a punishment upon the prisoner, but also a greater one than was annexed to the offense by the Act of 1774. But the preamble of a statute is no part of it. 6 Mod., 62. Although it is often proper to put such construction on a statute as will agree with the preamble, yet it ought not to be done, when thereby the enacting clause would be confined to it. 8 Mod., 144.
We must then consider the words of the enacting clause, without regard to the preamble, in case they cannot be reconciled. If any person hereafter shall be guilty of killing a slave, etc., such offender shall be adjudged guilty of murder, etc., and shall suffer the same punishment as if he had killed a free man. In case the person had killed a free man, what punishment would the law have inflicted upon him? (193) Before this question can be solved another must be asked, because upon that the solution of the first depends. What sort of a killing was it, or what circumstances of aggravation or mitigation attended it? Did the act bespeak such depravity of heart as would stamp it with the name of murder, or were they such as justified it? If of the former sort, capital punishment should be inflicted upon the author of it; if of the latter sort, he is guiltless. That to which the Legislature referred us for the purpose of ascertaining the punishment proper to be inflicted is in itself so doubtful and uncertain that I think no punishment whatever can be inflicted, without using a discretion and indulging a latitude, which in criminal cases ought never to be allowed a Judge.
It may be thought that the words "shall suffer the same punishment as if he had killed a free man," from the connexion [connection] in which they stand with the words preceding them in the same clause, viz.: "that if any person shall hereafter be guilty of willfully and maliciously killing a slave" should be allowed to have this meaning, and "shall suffer the same punishment as if he had willfully and maliciously killed a free man." I cannot agree to this construction, because it is a rule that penal statutes should be construed strictly. 1 Bl. Com., 88.
Much latitude of construction ought not to be permitted to operate against life; if it operates at all, it should be in favor of it. Punishments ought to be plainly defined and easy to be understood; they ought not to depend upon construction or arbitrary discretion.
Perhaps the Legislature did intend that those words should convey that meaning; but it is not certain that such was their intention; if it were, it might have been easily expressed; and, indeed, if it were so expressed, it would not be altogether free from uncertainty. But suppose that to have been their intention, and that intention plainly expressed *Page 171 
and free from uncertainty; is the benefit of clergy taken away? It is laid down in 2 Hale, 330, that where a statute makes a new felony, clergy is incident thereto, unless it be especially taken away by act of Parliament. This doctrine is recognized by Sir William Blackstone
in the fourth book of his commentaries, page 98; but I (194) think it unnecessary to consider this part of the case now; because, for the reasons given, I do not feel myself authorized by the act of Assembly to say that any punishment should be inflicted on the prisoner. I will only add that our Legislature seem to have also recognized the doctrine laid down by Lord Hale, because in the Act of 1774, before spoken of, the benefit of clergy is taken away in express words upon a second conviction, etc.; the same thing is evidenced by many other acts of Assembly.
II. But it has been also contended, on behalf of the State, that the offense with which the prisoner is charged is a felony at common law, and that having been found guilty by the jury, he ought to be punished, independently of any act of Assembly on the subject. This question arises out of the peculiarity of our situation; slavery not being known to the laws of England, from them we cannot derive our usual information.Sir William Blackstone says, liberty is so deeply implanted in the English Constitution, that the moment a slave lands there, he falls under the protection of the laws, and so far becomes a free man, though the master's right to his service may possibly continue. 1 Bl. Com., 127. From this expression I understand the author's meaning to be that the reason why the laws extend their protection to a slave is, because the moment he lands in England he undergoes a change, his condition is ameliorated, and in contemplation of law, at least, he is no longer a slave, but a free man. If this be the reason why a slave comes within the protection of the laws of England, it would follow that if a slave were carried there, and his condition of slavery were not altered, the laws would not extend their protection to him, because a slave in a pure state of slavery has no rights. President Montesquien, in his Spirit of Laws, Vol. I., Book 15, cap. I., and Sir William Blackstone in his Commentaries, Vol. I., 423, define pure slavery to be, that whereby an absolute power is given to the master, over the life and fortune of the slave. In some countries where slavery has existed, laws have been made from time to time, ameliorating its condition; (195) the power of taking away their lives, or cruelly treating them, has sometimes been restrained; these restraints, we find, were the consequence of positive laws; they did not exist before these laws imposed them; they were unknown in a pure state of slavery. It is said in Co. Litt., 116, b, that he that was taken in battle, remained bond to his *Page 172 
taker forever, and he could do with him as with his beast; he could kill him with impunity, etc. Afterwards we find it ordained that the life of a villein was not in the power of his lord; that he that killed his villein should have the same punishment as if he had killed a free man. The lord could not main his villein; if he did, the King would punish him for maiming his subject, because he disabled him, so that he could not do the King service. Co. Litt., 127, a. Villeinage, however, as it existed in England, reflects but little light on our subject; it had attached to it certain rights that were unknown to a pure state of slavery. We have seen that a villein is called the King's subject; that the King has a right to exact services from him; the lord's power over him was not absolute; a villein could not sue his lord, but could bring all manner of actions against every other person; he might have an action of appeal against his lord for the death of his father, etc.; Litt., sec. 189; he might be an executor, and in that capacity sue his lord; sec. 191.
Slaves in this country possess no such rights; their condition is more abject; 2 Sal., 666; they are not parties to our constitution; it was not made for them. What the powers of a master were over his slave, in this country, prior to the year 1774, have not been defined. I have not heard that any convictions and capital punishments took place before that period for killing of negroes. By an act of Assembly, passed in April, in the year 1741, cap. 24, sec. 54, it is declared that if, in the dispersing of any unlawful assemblies of rebel slaves, etc., apprehending runaways, etc., in correction, etc., any slave shall happen to be killed or destroyed, etc., the Court of the county, etc., shall put a valuation upon such slave. In the next succeeding section it is declared that (196) nothing herein contained shall be construed, deemed, or taken to defeat or bar the action of any person whose slave or slaves shall happen to be killed by any other person whatsoever, contrary to the directions, etc., of this act; but all and every owner, etc., shall and may bring his, her, or their action for recovery of damages for such slave or slaves so killed. From this part of the act, it appears that before the act passed an action could have been sustained by the owner of a slave against any person who killed him; the sole object of the last section is to fix such a construction on the first, and so to explain it, as that such action shall not be defeated or barred. It does not give the action, which before would not lie, but guards it from such construction as would tend to narrow its operation. If, then, this action could have been sustained, it must have been on the ground that slaves were considered as chattels. Killing a person may amount to felony or not, as the circumstances of the case may be that attend it. I understand that this action was sustainable in all cases of a killing of slaves, except in *Page 173 
the cases provided for in the 54th section. If the killing of a slave should be considered a felony at common law, in case it was done under the same circumstances of aggravation as in the case of a free man, would amount to felony, what would be the result? The person offending would be answerable, both civiliter and criminaliter. The trespass or civil injury would not be extinguished in the felony; but it would depend upon accident whether a recovery could be effected or not. If the indictment should be first tried, and the prisoner found guilty and executed, the action would be at an end; actio personalis moritur cumpersona, and I take that to be such an action as the maxim would bear upon. These are consequences I cannot be led to believe the Legislature intended to give rise to; that they did not may be further ascertained from the act passed in the year 1774, before mentioned; where it is mentioned that if any person shall be guilty of willfully and maliciously killing a slave, etc., such offender shall suffer twelve months imprisonment, and, upon a second conviction, shall be adjudged guilty of murder, and shall suffer death without benefit of clergy. In (197) sec. 3, it is further declared that such offender shall, on the first conviction thereof, pay the owner such sum as shall be the value of such slave; it is not expressed what compensation shall be made to the owner upon a second conviction, when the offender is to suffer death; nor does the Act of 1791 direct that compensation shall be made to the owner by the offender. So that it does not appear that the Legislature had an idea that the offender should suffer death and also make compensation to the owner of the slave, which, we have seen, would have been the case if the killing of a slave had been felony at common law.
The act passed in the year 1774 is entitled "An act to prevent the willful and malicious killing of slaves." If it was a felony at common law to do so, the punishment due to it was greater than that inflicted by this act. I admit that nothing decisive of the question is to be collected from the preamble, which expresses that doubts existed as to the punishment proper to be inflicted; it is true the Legislature might have thought that the punishment of death for the first offense was too severe, and therefore not proper to be inflicted, and in lieu of it have substituted one year's imprisonment.
The Legislature declare, in the act passed in the year 1791, sec. 3, that the punishment inflicted by the act passed in the year 1774 is too mild; and no doubt they intended, for the first offense, to inflict punishment of death upon the first conviction; if so, and it was a felony at common law to kill a slave under any circumstances, which, in the case of a free man, would amount to felony, would not the same end have been answered by repealing the Act of 1774 and leaving the offense to be *Page 174 
punished at common law, instead of passing an act intended to speak the same language and to inflict the same punishment as was spoken and inflicted by the common law?
I have taken this view of the acts of Assembly to ascertain, as well as I could, the opinion entertained by the Legislature on the latter question. From the consideration which I have given the whole case, if I ever felt disposed to act the most rigid part towards the prisoner, (198) the most I could say, and the greatest length I could go, would be that it is doubtful whether the offense with which he is charged is a felony at common law or not. If it is doubtful whether he ought to be punished or not, that, certainly, is a sufficient reason for discharging him; crimes and punishments ought to be ascertained with certainty. Feeling, however, as I do, but little doubt, I cannot hesitate to say that he ought to be discharged.